# IN THE COURT OF APPEALS OF IOWA

No. 14-1136
Filed December 23, 2015

**JESSICA WILBUR, Individually and As**
**Parent and Next Friend of I.N.,**
    Plaintiff-Appellee/Cross-Appellant,

**vs.**

**PAUL LAFAUCE and CHARLES PALMER,**
**Director of the Iowa Department of Human Services,**
    Defendant-Appellant/Cross-Appellees.
_____

Appeal from the Iowa District Court for Johnson County, Ian K. Thornhill, Judge.

The director of the department of human services appeals the awards of declaratory and injunctive relief and attorney fees, and Jessica Wilbur cross-appeals the jury's verdicts denying her monetary and punitive damages on her claim under 42 U.S.C. § 1983. **REVERSED ON APPEAL; AFFIRMED ON CROSS-APPEAL.**

Thomas J. Miller, Attorney General, Jeffrey S. Thompson, Solicitor General, and Charles K. Phillips and Molly M. Weber, Assistant Attorneys General, for appellant/cross-appellee.

Martin Diaz of Martin Diaz Law Firm, Iowa City, for appellee/cross-appellant.

Heard by Potterfield, P.J., and Doyle and McDonald, JJ.

**POTTERFIELD, Presiding Judge.**

The director of the department of human services (DHS) appeals the awards of declaratory and injunctive relief and attorney fees, and Jessica Wilbur cross-appeals the jury's verdicts denying her monetary and punitive damages on her claims against DHS child protective worker Paul LaFauce under 42 U.S.C. § 1983. Because Wilbur did not establish there had been a violation of her constitutional rights, and she no longer lives in the state of Iowa, she lacked standing to challenge DHS future actions by declaratory action. We reverse the district court's award of injunctive relief and attorney fees and costs. We affirm on Wilbur's cross-appeal.

**I. Background Facts and Proceedings.**

This suit arose as a result of dueling child abuse allegations assigned to DHS child protective worker Paul LaFauce concerning a child, I.N., born in 2004 to Jessica Wilbur.[1] The biological father of I.N. is Robert Nino. Wilbur was fourteen years old when she gave birth to I.N. and Nino was eighteen years old. Due to the parents' ages at the time of I.N.'s birth, Nino was placed on the sex offender registry. There is no decree fixing custody, visitation, or support between Wilbur and Nino. For all but ten months of I.N.'s life, the child has resided with her maternal grandmother Debra. Nino has sporadically visited with the child.

In 2009, Wilbur, her two children (I.N., and a younger half-sibling, S.F., born in 2008[2]), and Wilbur's paramour, Gilbert, were residing with Debra and

---

[1] Wilbur has since married and is now known as Jessica Coronado.
[2] S.F.'s father is no longer in the picture.

Wilbur's brother (age fourteen) and sister (age nineteen) in Guernsey, Poweshiek County, Iowa.

In early October 2009, Wilbur went to Texas with Gilbert and S.F. for an extended period, leaving I.N. with Debra. Nino arranged with both Wilbur and Debra to have visitation with I.N. the weekend of November 6-8.

Nino went with his sister and mother to pick up I.N. from Debra's home in Guernsey on November 6. He noted Debra's home did not smell good, and I.N. was dirty and wearing ill-fitting clothing. Nino took the child to his parents' mobile home in Iowa City, Johnson County, Iowa, where he was residing with his parents and his wife and their three children.[3] After arriving in Iowa City in the evening, I.N. was preparing to shower and Nino's wife discovered blood on I.N.'s underwear. Nino was concerned for I.N., but also concerned about his status as a sex offender. He contacted DHS and spoke with child protective worker LaFauce,[4] who instructed Nino to take I.N. for a physical examination. Nino expressed concerns that I.N. was not properly supervised in Debra's home and that I.N. had said she had been kicked in the stomach by Wilbur's sibling in that home.

At about 7:30 p.m. on November 7, I.N. was examined in the emergency room at University of Iowa Hospital and Clinics (UIHC). The examination report noted father's "concern of sexual assault." The examining doctor, Gregory Bell,

---

[3] Nino was in the process of moving to Marshalltown, Iowa, but he and his family were residing in Iowa City.

[4] LaFauce covers a five-county area, which does not include Poweshiek County. His case load involves eleven to twenty child abuse assessments, courtesy interviews and observations of children, and dependent adult abuse investigations per month. When "on-call," he responds to emergency calls from all five counties.

noted a reddened area around I.N.'s genitals. He consulted with Dr. Oral, the child protection team physician. Dr. Bell wrote in his report that "blood was evident at the vulvar area of the underwear." Dr. Bell determined that there was "a lack of any apparent trauma herein" to I.N., and she would be discharged with recommended follow up with Dr. Oral on Monday at the clinic. A UIHC social worker, Valarie Van Zee, interviewed Nino and Nino's mother during the hospital visit. Nino told Van Zee that I.N. said her uncle (Wilbur's brother) had hit her and that they slept in the same bed at times. Van Zee opined in her report,[5]

> I feel this is abuse because there is concern about patient's reactions to the questions asked of her about the blood on her underwear. Patient's father also has concerns for denial of critical care based upon the home environment. The ETC nurse did notice the patient was tearful when asked about the blood.

Nino was instructed to follow up with Dr. Oral and was given her phone number to call on Monday to make an appointment.[6] He took I.N. back to his parents' home in the early morning hours of Sunday, November 8, 2009. At 1:15 a.m., Van Zee informed LaFauce of the results of the medical examination, and recommended that DHS further investigate the allegations that I.N. had been sexually abused and denied critical care.

On November 8, Debra called Nino repeatedly, and he eventually informed Debra that he would not be bringing I.N. back to her. At about 1:10 p.m., the Johnson County Sheriff's Department received a call from Wilbur complaining of Nino's failure to return I.N. to Wilbur's mother. Officer Hipple

---

[5] LaFauce did not receive a copy of the UIHC emergency room visit report until November 10, 2009.

[6] Nino would testify the social worker at the hospital told him not to return I.N. to Debra's until he talked to LaFauce and that LaFauce told him the next day not to return her to mom or grandma.

wrote, "There are no custody arrangements made and child is not in danger, just mom wants grandma to have the child while she is in Texas. I told complainant I could not take the child from its father on her request. Ref to her attny."

At approximately 2:00 p.m. on November 8, Debra called the DHS child abuse hotline in Poweshiek County and reported that Nino had taken I.N. for a visit and was refusing to return her to her home in Guernsey. The complaint was forwarded to LaFauce as "it is a Johnson Co. case since [I.N.] lives in Iowa City now." DHS recorded a report that Nino was on the sex offender registry, "runs drugs and guns," and that many people lived in the mobile home where I.N. was staying. LaFauce consulted with the Poweshiek County DHS supervisor, Judy Davidson, and then spoke with Johnson Assistant County Attorney Beth Beglin, and Juvenile Assistant County Attorney, Kristin Parks, on Sunday, November 8 around 6:00 p.m. Attorney Parks suggested to LaFauce that he ask Nino to voluntarily place I.N. into foster care. At about 8 p.m. on November 8, LaFauce and a deputy sheriff went to Nino's home and obtained Nino's signature on a voluntary foster care placement agreement.[7] I.N. then was taken to a foster family. Nino would later testify he believed he did the right thing by agreeing to the voluntary placement on that Sunday.

On November 9 at 11:30 a.m., the Johnson County Sheriff's Office received a request from an attorney, Eric Sedig, to do a "welfare check" on I.N. because her father "will not give her back/father is a registered sex offender." Officer Kevin Elliot spoke with Nino at his home at about 12:20 p.m. and was told

---

[7] Voluntary foster care placements last no more than ninety days. DHS policy at the time was that the signature of one parent or guardian on that agreement was sufficient.

"LaFauce from DHS has the child, [I.N.], for an evaluation due to possible abuse while child was at her grandparents' house."

On the afternoon of November 9, LaFauce communicated to Debra that he was investigating reports of child abuse, and I.N. was in foster care. Debra told LaFauce Nino was I.N.'s father and I.N. "loves her dad and wanted to go with him last weekend." She stated no legal custody had been established in Iowa courts for custody between either parent, Debra did not have legal custody, and nothing was arranged by Wilbur in writing in terms of Debra's ability to seek medical treatment for I.N. while Wilbur was in Texas. LaFauce asked Debra to have Wilbur call him.

Wilbur learned about I.N.'s placement from Debra and Nino. At some point thereafter she began the car trip back from Texas to return to Iowa. (Wilbur testified it was a twenty-hour drive and she and Gilbert arrived in Iowa in the early morning hours of Tuesday, November 10.)

LaFauce arranged to have I.N. interviewed at the area Child Protective Center (CPC). On Tuesday afternoon, November 10, I.N. underwent a physical and gynecological examination and was interviewed at the CPC. During the interview, I.N. stated she lived with her grandmother, aunt, and uncle. She stated her mother was in Texas with I.N.'s little sister and I.N.'s stepdad, Gilbert, who "lives in Texas." She stated her aunt and uncle sometimes babysit her; she did not report being hurt by grandmother, aunt, or uncle.

At 4:30 p.m. on November 10, Wilbur contacted LaFauce. She told him she just arrived in Iowa and had been in Texas the last two months, she was engaged, and had been in Texas caring for her fiancé's relatives. LaFauce

conveyed to Wilbur that I.N.'s CPC examination was completed and "updated her on the medical evaluation and interview results." Wilbur told LaFauce Nino was I.N.'s father and she wants him to be in I.N.'s life. She also told him there had been no legal custody established in court. LaFauce spoke with Wilbur "about the importance of getting legal custody established and the importance of a more formal custodial and visitation arrangement especially if she is going to be gone so much and be out of the state for extended periods of time." LaFauce told Wilbur that Nino had voluntarily placed I.N. in foster care but had then asked that the child now be placed with his sister Ruby until further investigation was complete and Debra's home could be assessed, to which Wilbur responded "good." LaFauce also told Wilbur that DHS was not open the next day (which was Veterans' Day) and that he would be unavailable that day as he was on call, and he would be out of office Thursday evening and all day Friday, but would "try to get a courtesy[8] observation request for her and [Debra's] home done by the end of this week or early next week." His notes indicate he also told her,

> [O]nce the courtesy interviews and observations were complete if the home is safe [I.N.] could be returned as early as . . . next week. I told her that due to the nature of the allegations I would need to consult with the Johnson Co. Attorney on Thursday to review the case with them.

On November 11, Attorney Natalie Cronk telephoned LaFauce and stated she represented Wilbur, who wanted her child back. LaFauce informed her that the child had been placed in voluntary foster care by the father. Cronk asserted the father had no right to make such an agreement, with which LaFauce

---

[8] "Courtesy" in this context refers to one county's DHS seeking assistance from another county.

disagreed. Cronk asked how the mother could get her child back and LaFauce informed her of the concerns about the grandmother's home.

On Wednesday November 11, I.N. was transferred to Nino's sister Ruby. Ruby signed a safety plan agreeing she would not allow contact between I.N. and Nino, she would "assist with all visitations between I.N. and her parents," would comply with all DHS requests for services, and keep eye contact with the child if she was playing outside. The safety plan was not signed by either of I.N.'s parents.

On Friday, November 13, Cronk, on behalf of Wilbur, filed a petition for writ of habeas corpus, asserting I.N.'s removal was illegal and demanding the return of the child. Notice was served at LaFauce's office that day. LaFauce was working in Des Moines that day and did not return to the office until 6 or 7 p.m. A hearing on that petition was set for December 1.

At about 4:45 p.m. on Monday, November 16, LaFauce spoke with Wilbur and informed her he would be requesting that Poweshiek County DHS make a courtesy observation of her home, conduct courtesy interviews, and make an assessment as to I.N.'s safety.

On Tuesday, November 17, Poweshiek County DHS worker Megan See conducted the courtesy assessment of Debra's home at LaFauce's request. See spoke with Wilbur that day; she did not speak with Debra as she was not there. Wilbur told See she would not be comfortable having her sister watching I.N. because she was developmentally delayed and had poor anger control. After hearing from See at about 3 p.m., LaFauce prepared a safety plan to present to Wilbur pursuant to which I.N. would be supervised by appropriate caretakers and

not Wilbur's sister, and would provide Debra with "appropriate paperwork so that I.N.'s medical and educational needs are met when [Wilbur] is not available." LaFauce contacted Wilbur and they made an appointment for her and Debra to come to his office to discuss matters on November 18 at 4:45 p.m.

On November 18, at about 2:50 p.m., Wilbur called LaFauce and informed him she would not sign the safety plan on advice of her attorney.

In a letter dated November 18, Cronk wrote to LaFauce and Paige Casteel (LaFauce's supervisor) asserting, "It is . . . my understanding you have no Order granting authority to restrain, place, or otherwise withhold the child from her mother. In effect, you have kidnaped her from her mother." The letter continued, "Unless you can provide me with documentation to the contrary today, by the close of business, my client intends to pick up her child at the home of Ruby . . . today where you have put [I.N.], directly following your receipt of this letter." Cronk's letter was served at LaFauce's office at 4:15 p.m.

LaFauce called Wilbur at about 5 p.m. and left a message asking if she was still coming to his office.

Wilbur did not attend the meeting scheduled with LaFauce. Rather, she, Debra, Cronk, and a private investigator arrived at Ruby's home and Wilbur stated she was there to get I.N. The private investigator was recording the interaction.[9] A chaotic situation ensued. Several members of Nino's family lived in the same neighborhood as Ruby. I.N., who had been shopping with another aunt, arrived in a car. I.N. saw her mother and gave her a hug, saying something

---

[9] The video recording of the interaction is very difficult to see as it was dark at the time of the recording.

to the effect, "I didn't think I would see you." Nino got a call from his sister, Becky, saying Wilbur and her mother were trying to take I.N. Nino called LaFauce and said Wilbur was trying to take I.N. from Ruby. Ruby got a call from LaFauce and while on the phone with him at about 5:20 p.m., Wilbur carried I.N. to her vehicle. Ruby and Nino (who had arrived at the scene) protested, but Wilbur and Debra drove off with I.N., leaving behind Cronk and the private investigator. Nino attempted to follow Wilbur's vehicle and "was thinking about stopping them. And then I realized my daughter was in the car and I just—I got upset." Nino called the sheriff's office and was told there was nothing they could do.

Johnson County DHS requested courtesy welfare checks be made at Debra's home in Poweshiek County because DHS had not been able to speak with Debra about concerns of Wilbur's sister caring for I.N. Casteel later testified those attempts were unsuccessful in speaking with Debra because they "didn't at any time find anybody when they went out."

On December 9, LaFauce completed his child abuse assessment report.[10] I.N. was back in Poweshiek County, not Johnson County. LaFauce later completed an affidavit, which was used as the basis for a child-in-need-of-assistance petition filed in Poweshiek County. The petition asserted I.N. was likely to suffer harmful effects as a result of the failure of a parent, guardian, or custodian or other member of the household in which the child resides to exercise a reasonable degree of care in supervising the child.

---

[10] DHS is required to complete a child abuse assessment within twenty working days.

On January 5, 2010, Wilbur filed a "petition at law, for declaratory judgment, for injunction and jury demand," pursuant to 42 U.S.C. § 1983, alleging: she had sole custody of I.N. pursuant to Iowa Code section 600B.40; Nino had no custodial rights to the child; "[a]t the time when [LaFauce] obtained the voluntary foster care placement agreement from Mr. Nino, [he] knew that Robert Nino did not have a court order granting him custodial or visitation rights"; LaFauce transferred I.N. out of the foster home, "and without any legal basis, transferred her care to the sister of Robert Nino," who "was not a qualified foster care provider, nor was her home a qualified foster care home"; on November 12, LaFauce was advised by the county attorney's office that the fact Nino was a registered sex offender did not prevent him from having contact with his biological children and "there was no legal basis to proceed to remove [I.N.] from her mother's home"; despite a writ of habeas corpus being filed on November 13, and without legal basis, "LaFauce and IDHS continued to refuse to return" the child to Wilbur; on November 16, LaFauce prepared and sent parental notification of a child-abuse assessment advising Wilbur two allegations of child abuse were being assessed, one of which was allowing access to the child by a registered sex offender; on November 18, Wilbur advised DHS that unless it could produce an order granting authority to restrain or otherwise withhold the child from Wilbur, she "would take steps to pick up the child at the home of Mr. Nino's sister"; DHS "failed to produce any order"; Wilbur went to recover the child from Nino's sister and "LaFauce sought to intervene and prevent [Wilbur] from recovering her child"; and Wilbur and her daughter had constitutionally protected

liberty, property, privacy, and procedural and substantive due process rights in their continued parent-child relationship" with which LaFauce interfered.

Wilbur asked for monetary and punitive damages against LaFauce. She also asserted:

> 51. Further, under 42 U.S.C. § 1983, [Wilbur] seeks declaratory and injunctive relief against Charles Krogmeier,[11] in his official capacity as the Director of the Iowa Department of Human Services, declaring (enjoining), as a violation of Iowa law and constitutional principles, IDHS' policy of taking possession and control of children by obtaining signatures on voluntary foster care placement agreements from parents who have not yet established custodial rights.
>
> 52. In addition, under 42 U.S.C. § 1983, [Wilbur] seeks declaratory and injunctive relief against Charles Krogmeier, in his official capacity as the Director of the Iowa Department of Human Services, declaring (enjoining), as a violation of Iowa law and constitutional principles, IDHS' policy of taking possession and control of children by obtaining signatures on voluntary foster care placement agreements from only the non-custodial parent.

An answer was filed on behalf of LaFauce and the director in which it was asserted, in part, Iowa Code section 600B.40 had no application in cases where the father has acknowledged paternity and "the grandmother appears to have been serving as the child's custodian during much of the time prior to the investigation." The answer also stated, "[T]he grandmother allowed the child to go with Nino, DHS interviewed Nino and "discussed concerns about the child," the child was evaluated and no evidence of physical trauma was found, but "[i]t is denied the evaluations reached the conclusions as to the occurrence of abuse." Further, "LaFauce was advised that neither parent had a court order and that the nature of their custodial arrangements was informal." It was asserted the placement with Nino's sister was "with the agreement of both parents." The

---

[11] Charles Palmer was later substituted as defendant director of DHS.

answer also asserted, "It is admitted that the parent child relationship is protected by the constitution. It is denied that the provisions cited by [Wilbur] were violated in this matter, or that [Wilbur] has standing to raise them. . . ." A number of affirmative defenses were raised, including that Wilbur lacked standing to assert a Fourth Amendment claim on her own behalf, or to assert rights other than those of the named plaintiffs, the defendants were entitled to qualified or absolute immunity, and "[t]he issues regarding the validity of the foster placement agreements and safety plans are moot."

LaFauce and the director filed a motion for summary judgment. In support of that motion, they argued, in part, that Wilbur had not stated a violation of a clearly established federal right that would entitle her to injunctive relief, and she had failed to show she will suffer harm if injunctive relief is not issued or to allege a personal stake in the future of DHS's policy regarding voluntary placement— "She lives in Texas and does not allow the Iowa father to see the child." The motion stated Wilbur did not allege any ongoing threat that the challenged practices applied to her. LaFauce also argued he was entitled to qualified immunity. The district court ruled disputed material facts precluded summary judgment, and the matter proceeded to trial.

*Jury trial regarding 42 U.S.C. § 1983 claims*.

Wilbur's 42 U.S.C. § 1983 claims were tried to a jury on January 28 through February 4, 2014. Wilbur's monetary claims against LaFauce were rejected by the jury, which found LaFauce did not violate Wilbur or I.N.'s constitutional rights of privacy or due process.

*Request for Declaratory and Injunctive Relief.*

On February 5, 2014, while the jury was deliberating the damages claims, the district court heard Wilbur's claim for declaratory and injunctive relief. The director objected as Wilbur now lived in Texas. The director also argued it was not at all clear on what constitutional grounds Wilbur was seeking injunctive relief. The court noted the objections and proceeded to receive evidence.

Cronk—having withdrawn as counsel for Wilbur—testified that prior to November 2009 she had seen the use of a voluntary foster care placement agreement signed by the noncustodial parent only five times. The voluntary foster care placement agreement form (form 470-0715) used in November 2009 stated it must be signed by a parent, guardian or child age 18 or older. However, the form was revised in December 2011, and the DHS manual in July 27, 2012, and now requires, "Both parents' signatures are necessary when both have custody of the child." Cronk testified she had not seen the revised form used where both parents had signed, but had seen it used where only one parent had signed.

Prior to Cronk testifying about DHS's use of safety plans, the director objected on relevancy grounds because the petition did not raise any claim as to safety plans. The court noted the objection. Cronk was asked if she had seen a safety plan used "to take a child out of their home and into another place." Cronk testified she has seen the use of safety plans for out-of-home placement not involving a CINA in "a couple hundred" cases. The DHS manual states safety plans are to be used "when it's been determined that a child is conditionally safe in their home." They can be signed by a "parent/caregiver."

It was Cronk's opinion that DHS cannot employ and parents cannot engage with DHS in a voluntary foster care arrangement for the best interests of the child absent imminent danger. [12] She opined, "DHS should never seek the removal of a child under any circumstances unless the child cannot safely remain in the home."

Wendy Rickman, a division administrator at DHS, was asked, "What statutory authority was there for the use of a Voluntary Foster Care Placement Agreement such as this form back in 2009?" She responded:

> The federal statutory authority comes from primarily two sections of the Social Security Act. Title IV-E really under that Act articulates how foster care payments are paid for or how the federal partners share in the payment of foster care placement, so that's more of a fiscal section. And that section speaks to voluntary placements. The second is Title IV-B, which lays out more of the federal expectation around our practice with our families. So one is fiscal, one is more practice. In the Iowa Code, we use . . . 232 of the Iowa Code.

Rickman testified about the changes in DHS policy with regard to voluntary foster care placement agreements; the department now seeks both parents' signatures. She stated that policy was a result of "moving toward more fulsome agreement of all parties in a case over a period of time." Plaintiff's counsel asked, "And did that grow out of a belief that there was a fundamental constitutional right that each had to the relationship with the child?" Rickman answered, "Yes."

---

[12] Iowa Code section 232.78 governs "temporary custody of a child pursuant to ex parte order" of the court. Section 232.79 allows a "peace officer or juvenile court officer" to "take a child into custody" without a court order and without the consent of a parent, guardian or custodian if the child is in "imminent danger" and "[t]here is not enough time to apply for an order under section 232.78."

On cross, Rickman repeated there are federal and state legal authorities for voluntary placement agreements. She also acknowledged Iowa Code chapter 234 deals with temporary custody and section 234.35 "talks about circumstances under which we can get voluntary placements into place."[13]

Concerning the change in policy regarding parents' signatures on voluntary foster care placement, she explained:

> Primarily the issue mostly centered around noninvolvement—our inability to involve noncustodial fathers. So over the past several years, there's been a much deeper understanding of the need for typically dads in their families and so we've put a much heavier push on the idea of that both parents need to be involved. But the issue grew initially because our primary relationship typically was with mothers and that we were not doing the job that we should do to involve the fathers in the case planning around their children.

Rickman expressed the opinion that requiring the signature of both parents or even the "custodial" parent on either the voluntary foster care placement agreement or a safety plan in all instances would be detrimental. She explained that

> our requirement for due diligence of our workers to involve both parents and other family members in this case planning activity is adequate. To further limit our ability to work with the family unit as it exists or as we can ascertain would limit our ability to do good case planning on the part of kids and their parents.

The trial judge also asked its own questions of Rickman. The court asked what authorizes DHS to have a safety plan with a nonparent that limits contact with the parents. Rickman said DHS would not have such authority; "it's not effective." She testified Ruby had been placed in a difficult situation here.

---

[13] Iowa Code section 234.35(c) states DHS is responsible for paying the cost of foster care for a child "[w]hen the department has agreed to provide foster care services for the child for a period of not more than ninety days on the basis of a signed placement agreement between the department and the child's parent or guardian."

The trial judge also asked what authority existed for DHS to ask Wilbur to enter into a safety plan before returning the child to her; "I'm talking about the fact scenario we have here where, again, there's an argument that can be made that the child was, quote unquote, being held hostage until the safety plan was negotiated." Rickman explained:

> Specifically to this case, I believe the mom knew and understood and agreed with the idea that dad was a good placement for the kid, whether it was visitation or spending time with him. I believe she was in agreement with the placement at the aunt's house. I think we had a good conversation with her about that. I think they saw that relative as an appropriate placement. A lot of the concern that we had about [maternal sister], the sister in the grandmother's house, that concern actually came to us from the mom. When we interviewed the mom, she talked about [sister] kicking and biting and being physically aggressive and not understanding what her actions meant and baby-sitting. So there had been, in this particular case, a set of conversations that conveyed to us, conveyed to that worker—and it's a typical way that these case progress—that she was in agreement with where we are and was in agreement with the idea that she would remedy the situation at Debra's, that she intended to go back there and that if we had concerns, she was in agreement that that should be remedied and we'd do it in a safety plan. And that went all the way through the afternoon until, frankly, [I.N.] was taken out of the aunt's house.
>
> . . . .
>
> Q. [By Court] And again, I'm not trying to split hairs, but you used the word return [the] child to her and I guess that's what I— one of the things I'm hanging up on here is: By saying you're on a path to return the child to her, that's an admission that you were in possession of the child, and that something else had to happen before the child could go back to mom? A. I think—I do think that's true.
>
> Q. [By Court] And if I'm reading your answer right or understanding your answer right, you believe that mom up to that point had consented? A. Okay.
>
> Q. [By Court] And then is it true that after Ms. Wilbur retrieved the child from Ruby's house that no other action was immediately taken to go after the child or somehow obtain custody or an order to get this child back away from mom? A. No. I think— We asked for a safety check at that point at the grandmother's house and I can't recall exactly how that was carried out[.]

The court also asked that LaFauce's supervisor, Paige Casteel, be called back to testify. Neither party had questions for Casteel. However, the court asked Casteel what her "impression was" as to Nino's questions about wanting advice on custody. After Casteel explained that Nino was informed DHS did not give legal advice, the court then asked, "So from that conversation, were you aware that there were no formal custody orders in place?" She stated they knew paternity had been established and he'd had contact with the child but there was never a formal custody or visitation arrangement. The court continued questioning Casteel about what authority Nino had over the child; "So you are telling me that just based upon Mr. Nino's status as a biological parent, you felt that he had some sort of custody rights over [I.N.]?" Casteel explained, "Yes. And he had her at that time."

The court asked Casteel on what authority DHS asked Wilbur to sign a safety plan. Casteel explained a safety plan is a voluntary document and if a parent is not agreeable "it could lead to something that we talk to the County Attorney about if we need to further protect the child." The court asked if Wilbur signing the safety plan was a condition of having I.N. returned, and Casteel said, "No. That's not what we were thinking then." The court continued to question Casteel.

The district court required the parties to provide post-trial filings. From plaintiff, the court stated, "[W]hat I want from you is, again, a summary of the relief you're requesting and your authority for that. Presumably you may want to address the issues raised by the defense, the standing issues and whether it's a facial challenge or an as-applied challenge." From the director, the court stated,

"[O]bviously what position—what you're asking me to do or what you believe I don't have any authority to do given the procedural posture of the case."

When plaintiff filed her post-trial brief, she also filed an affidavit in which Wilbur stated she lived in Texas but two of her children returned to Iowa each summer and resided with their grandmother and their fathers lived in Iowa.

In its June 30, 2014 ruling, the district court set out Wilbur's assertions and the parties' arguments concerning the requested declaratory ruling and injunctive relief.

> Plaintiff asserts the Court should declare that permitting only one parent to sign a child into foster care violates the constitutional rights of the other parent, where the other parent has the right to custody of that child, and it also violates the rights of the child, who has a privacy interest in not being seized from the care of a custodial parent. Plaintiff further asserts that Iowa law, under Iowa Code § 600B.40, recognizes that when a child is born out-of-wedlock, the mother has sole custody. Plaintiff contends that a [Voluntary Foster Care Placement Agreement] VFCPA can never be used with an out-of-wedlock father who has not acknowledged paternity, or one where paternity has been established but no custodial rights have been adjudicated by the Court. Plaintiff also contends that, when the Court has established custodial rights to a child, it is a violation of the custodial parent's right to the custody of the child to allow a non-custodial parent to separately consent to the transfer of custody to Iowa DHS. Plaintiff requests the Court enjoin Iowa DHS from creating policies or procedures, or carrying out practices, that violate these requests.
> With respect to Safety Plans, Plaintiff argues that using a safety plan to remove or keep a child from her usual and customary home, without the consent of the child's primary custodian, is unconstitutional. Plaintiff further argues that the use of a Safety Plan to prevent a parent from having physical contact with her child, without the consent of the parent, also is unconstitutional. . . .
> . . . .
> Defendants' position is that, without a constitutional violation, there can be no relief, and once the jury determined there was no constitutional violation, the right to any type of equitable relief vanished. Defendants further argue that even if Plaintiff had prevailed on the constitutional claims, Plaintiff would not be entitled to equitable relief because Plaintiff has not proven an immediate

and real threat of irreparable future injury. Defendants contend it is undisputed that Jessica and [I.N.] no longer reside in Iowa and moved to Texas in 2011, where they have remained. Defendants also contend there is no immediate threat to Plaintiff from Iowa VFCPAs, and Plaintiff has no personal stake in the use of such agreements by DHS in the future. Defendants assert Plaintiff has not shown a real and immediate threat of irreparable harm, and Plaintiff did not present any evidence that Plaintiff may be subject to future placement of the child based on the child's relationship with her father. Defendants further assert that Plaintiff is not entitled to declaratory relief because Plaintiff has not shown an immediate and real future controversy with the Iowa DHS.

Defendants also argue that Plaintiff has not formally sought injunctive or declaratory relief with regard to Safety Plans, which Defendants claim is evidenced by the pleadings.

Defendants further argue that the claims for equitable relief have been rendered moot by the DHS's new policy of requiring the signature of both parents on VFCPAs.

Finally, Defendants argue that VFCPAs are authorized by the Iowa Code. Defendants assert they must seek a VFCPA prior to seeking formal removal of the child (pursuant to Iowa Code § 232.78(1)(a)) and the DHS is empowered to pay for such placements (pursuant to Iowa Code § 232.35(1)(c)). Defendants further assert that pursuant to § 232.78(1)(a), placements may occur for up to 90 days, or longer for mentally disabled children if reviewed by a board or a Court.

The court concluded Wilbur

has standing to seek equitable relief, in that she has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy. [Wilbur] is a proper party to state the equitable claims. [Wilbur] has made allegations that she and [I.N.] were victims of unconstitutional acts, which she seeks to have declared unconstitutional and enjoined, and her affidavit establishes that she has continuing contact with the State of Iowa and potentially could be at risk as to future potentially unconstitutional acts on the part of DHS. The Court accepts [Wilbur]'s affidavit over the objection of Defendants because it directly relates to all of the equitable issues presented by the parties in this litigation. The affidavit is properly considered as part of Plaintiff's post-trial filings because the affidavit is provided in support of the equitable issues the parties previously were ordered to address following trial of the other issues presented in this action. Further, there has been a full opportunity for Defendants to litigate all of the equitable issues, particularly given the multiple and

repeated references to these issues in Plaintiff's pleadings throughout the course of this matter.

The district court continued:

> The Court finds [Wilbur] has met her burden of proof regarding the declaratory and injunctive relief she seeks, and the Court concludes that [Wilbur] is entitled to declaratory and injunctive relief with respect to the equitable issues presented for the Court's consideration. Wendy Rickman's testimony establishes that the DHS has come to believe, as shown through the development of new policy, that there is a fundamental constitutional right that each parent has to the relationship with a child. Ms. Rickman's testimony also established that the 2005 audit of DHS by the federal government triggered a process that began in 2006 in which DHS sought to restructure its practices towards a more "fulsome agreement" of all parties to a case. Ms. Rickman's testimony shows that DHS has been aware for several years that its practice of obtaining only one signature on a [voluntary foster care placement agreement] VFCPA was a potential violation of the constitutional rights of a parent-child relationship. Further, DHS has gone on to change its practices and policies with regard to VFCPA. While the *Heartland* [*v. Academy Community Church v. Waddle*, 427 F.3d 525, 530 (8th Cir. 2005),] case makes reference only to federal courts having authority to issue an injunction to prevent state officials from violating the Constitution without running afoul of the Eleventh Amendment, the Court finds it is a logical extension of the *Heartland* case to apply to state court cases, particularly where, as here, testimony of a DHS representative shows that the DHS was aware that its practice regarding VFCPAs potentially was in violation of the parent-child relationship. While DHS has relied on provisions of Iowa Code chapter 232 as statutory authority for VFCPAs, the Court concludes DHS's reliance on Iowa Code § 232.78 *et seq.* does not provide authority for foster care placement in the context of child abuse investigations, as VFCPAs stem from Iowa Code § 232.175.
>
> Thus, the Court hereby declares that it is unconstitutional for the Iowa Department of Human Services to use Voluntary Foster Care Placement Agreements signed by only one parent when the use of such Agreements interferes with the custodial rights of the other parent, and it is unconstitutional for the Iowa Department of Human Services to use Voluntary Foster Care Placement Agreements signed by a non-custodial parent or a parent who has not yet established any custodial rights. Further, the Iowa Department of Human Services hereby is enjoined from engaging in such practices in the State of Iowa. An injunction is appropriate given that the issues involved in this case pertain specifically to the

parent-child relationship, which is a fundamental liberty interest under the United States Constitution. Interference with this fundamental liberty interest may lead to invasion or threatened invasion of a right; to substantial injury and/or damages; and may cause irreparable damage.

Turning to Plaintiff's request for relief regarding Safety Plans, the Court concludes that Ms. Rickman's testimony establishes that DHS has both parents sign the Safety Plan because each parent has a constitutional right to the parent-child relationship. Ms. Rickman's testimony also establishes that DHS has no authority to utilize Safety Plans signed by third parties, or to utilize Safety Plans that restrict access to a child by a parent who has not signed the Safety Plan.

Thus, the Court hereby declares that it is unconstitutional for the Iowa Department of Human Services to utilize Safety Plans that remove or keep a child from his or her usual and customary home, without the consent of the custodial parent; to utilize Safety Plans to prevent a parent from having physical contact with the child, without the consent of that parent; and to utilize Safety Plans with third-parties/non-parents of the child. Further, the Iowa Department of Human Services hereby is enjoined from engaging in such practices in the State of Iowa. The injunction is appropriate for the same reasons the Court found fit to establish injunctive relief with respect to the Voluntary Foster Care Placement Agreements.

The Court finds that the jury's verdict in this case does not preclude the Court from entering equitable relief against the DHS. While the specific facts of Plaintiff's case did not provide a basis for her to prevail on her legal claims, the Court views the equitable claims as a different matter because said claims specifically pertain to the policies and practices of the Iowa DHS, regardless of whether those policies and practices apply to Plaintiff or to any other parent with DHS involvement. As Plaintiff states in her Response to Defendants' Brief on Equitable Relief, "the facts on which the jury may have based its verdict may have nothing to do with the constitutionality of the challenged practices and procedures." See Response, p. 2. The Court's ordering of declaratory and injunctive relief is intended to ensure that DHS does not continue with what it has admitted to be an unconstitutional practice. Therefore, Plaintiff's claim is not rendered moot by the DHS's 2012 policy change regarding VFCPAs. Additionally, as Plaintiff points out, it does not appear the 2012 policy change specifically incorporates the DHS's position regarding Safety Plans.

The trial court assessed costs one-half to Wilbur and one-half to the director.

The court asked for briefs on "whether an award of attorney fees may be appropriate under these circumstances." Wilbur requested attorney fees and expenses. The director objected on two grounds: (1) Wilbur was not a "prevailing party" for purposes of 42 U.S.C. § 1988; and (2) even if she achieved some degree of success, the fees requested must be reduced to coincide with the limited success achieved.

*Attorney fees.* The district court concluded Wilbur

was successful in obtaining equitable relief against DHS, and without Plaintiff bringing her claims before the Court, it is unlikely that DHS would have voluntarily made the changes to the policies and practices that now have been enjoined by the Court. Regardless of the outcome of Plaintiff's constitutional claims, Plaintiff achieved a significant victory in obtaining the equitable relief order by the Court. The legal relationship between Plaintiff and DHS was altered, in that DHS can no longer engage in unconstitutional practices related to safety plans and . . . VRCPAs. Further, to the extent that any of Plaintiff's children are again subject to DHS proceedings in Iowa, the fact that DHS has been enjoined from engaging in unconstitutional practices directly benefits Plaintiff.

The court awarded Wilbur attorney fees and expenses to be paid by DHS (not LaFauce or the director) in the amounts of $8212.50 for attorney trial time, $65,616 for other attorney fees, and $7138 in expenses related to the "equitable issues" and the Martin Diaz Law Firm, and $17,990 in attorney fees and $7.84 in expenses for Natalie Cronk's work prior to withdrawal.

The director appeals the awards of declaratory and injunctive relief and attorney fees, and Wilbur cross-appeals the jury's verdicts denying her monetary and punitive damages. Our supreme court consolidated the appeals, stayed the injunctive relief granted by the district court, and transferred the case to us.

**II. Scope and Standard of Review.**

We review constitutional claims de novo. *Hensler v. City of Davenport*, 790 N.W.2d 569, 578 (Iowa 2010). "In doing so, we independently evaluate the totality of the circumstances." *Id.* We are not bound by the district court's findings of fact. *Id.* We do, however, give deference to those findings because the district court had the opportunity to assess the credibility of the witnesses. *Id.*

**III. Discussion.**

*A. General principles.*

We begin by acknowledging the constitutional rights of parents and children in familial association.

> The United States Supreme Court has consistently recognized that a parent's "care, custody, and control" of a child is a fundamental liberty interest given the greatest possible protection. *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) (plurality opinion); *Stanley v. Illinois*, 405 U.S. 645, 651–52 (1972). A parent's interest in preserving family relationships is best protected by the Due Process Clause. *Alsager v. Iowa Dist. Ct.*, 406 F. Supp. 10, 21–22 (S.D. Iowa 1975), *aff'd in part*, 545 F.2d 1137 (8th Cir. 1976).
>
> The Supreme Court has also recognized that a parent's right to the care and custody of a child is reciprocated by the child's liberty interest in familial association, likewise protected by the Due Process Clause. *See Lehr v. Robertson*, 463 U.S. 248, 256 (1983) (noting reciprocal nature of interest); *Moore v. City of East Cleveland*, 431 U.S. 494, 503–05 (1977) (noting the private realm of family relationships); *Wallis* [*v. Spencer*], 202 F.3d [1126,] 1136 [(9th Cir. 1999)] ("Parents and children have a well-elaborated constitutional right to live together without governmental interference.").

*F.K. v. Iowa Dist. Ct.*, 630 N.W.2d 801, 808 (Iowa 2001); *see also In re J.L.*, 779 N.W.2d 481, 489 (Iowa Ct. App. 2009) ("A child's liberty interest in familial association is protected by the Due Process Clause and the State may only interfere with this liberty interest after providing the children due process of law.").

Those rights, however, are not absolute.  *In re K.M.*, 653 N.W.2d 602, 608 (Iowa 2002); *see also Thomason v. SCAN Volunteer Servs., Inc.*, 85 F.3d 1365, 1371 (8th Cir. 1996).

> "[T]the liberty interest in familial relations is limited by the compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves." Moreover, as the First Circuit has correctly noted, "[t]he right to family integrity clearly does not include a constitutional right to be free from child abuse investigations."

*Thomason*, 85 F.3d at 1371 (citations omitted); *see also F.K.*, 630 N.W.2d at 809 (stating the State "bears the heavy responsibility of assur[ing] that every child within its borders receives proper care and treatment" and "[p]rompt attention to the duty is demanded when the health or safety of the child is at risk" (citations omitted)).

The jury rejected Wilbur's claims that LaFauce and the director violated her or I.N.'s procedural or substantive due process rights and I.N.'s Fourth Amendment rights.  Nonetheless, the district court granted injunctive relief "intend[ing] to ensure that DHS does not continue with what it has admitted to be an unconstitutional practice."[14]

*B. Director's appeal.* Here, the district court granted declaratory and injunctive relief upon its finding Wilbur "potentially could be at risk as to future potentially unconstitutional acts on the part of DHS."  The director argues that

---

[14] We have reviewed this record and cannot conclude there exists an "admitted" unconstitutional practice.  As best we can discern, the district court is referring to Ms. Rickman's testimony, the sum and substance of which was that DHS policy with respect to parental signatures on voluntary foster care agreements has changed as a result of "moving toward more fulsome agreement of all parties in a case over a period of time." Plaintiff's counsel asked, "And did that grow out of a belief that there was a fundamental constitutional right that each had to the relationship with the child?"  Ms. Rickman answered, "Yes."  This is not an admission of an unconstitutional practice.

Wilbur lacks standing on the claims for declaratory and injunctive relief, and alternatively, the standards for relief have not been met. We agree.

Here, Wilbur sought to have certain practices of the Iowa DHS declared unconstitutional and enjoined from future use.[15] To obtain declaratory relief, "[a] plaintiff must (1) have a specific personal or legal interest in the litigation and (2) be injuriously affected." *Godfrey v. State*, 752 N.W.2d 413, 418 (Iowa 2008) (citation and internal quotation marks omitted). "To satisfy the first element, we require the litigant to allege some type of injury different from the population in general. To satisfy the second element, the injury cannot be 'conjectural' or 'hypothetical,' but must be 'concrete' and 'actual or imminent.'" *Hawkeye Foodservice Dist., Inc. v. Iowa Educators Corp.*, 812 N.W.2d 600, 606 (Iowa 2012) (citation and internal quotation marks omitted).

The jury found that Wilbur's procedural and substantive due process rights and I.N.'s procedural and substantive due process and Fourth Amendment rights had not been violated.[16] Nonetheless, the district court—relying upon Wilbur's post-trial affidavit—concluded Wilbur, who asserted she lived in Texas, had standing to seek declaratory and injunctive relief because of her "continuing contact with the State of Iowa" and that she "potentially could be at risk as to future potentially unconstitutional acts on the part of DHS."[17] This is not sufficient to establish a legal interest in her claims for injunctive relief.

---

[15] As already noted above, the director objected to any assertions regarding safety plans because such claims were not included in the petition or amended petition.

[16] We will address Wilbur's challenge to the jury findings later in this opinion.

[17] Wilbur asserts in her appeal brief that standing was not properly raised as an issue and that "the word 'standing' when complaining about the relief sought" was not used prior to trial. The record belies this claim. The defendants asserted Wilbur lacked standing in their answer and on numerous occasions thereafter.

Even considering Wilbur's post-trial affidavit, her claim that she may be in Iowa and perhaps subject to DHS action in the future is no different than the general public, and does nothing to establish a real and immediate threat that she would again be subject to the DHS practices of which she complains. *Godfrey*, 752 N.W.2d at 423.

This court discussed the injury element of standing in *Banks v. Iowa Department of Public Safety*, No. 10-0683, 2010 WL 4140456, at *3-4 (Iowa Ct. App. Oct. 20, 2010). There, the appellant sought to "vindicate a public interest" by challenging allegedly illegal governmental action. *Banks*, 2010 WL 4140456, at *3; *see Godfrey*, 752 N.W.2d at 420 (concluding "cases involving actions by private persons to enforce public rights may be brought under the personal-interest alternative to the first element" where there is a specific personal or legal interest in the litigation). We observed that under *Godfrey* the challenger must allege some type of injury different from the population in general. *Banks*, 2010 WL 4140456, at *3. We quoted *Alons v. Iowa District Court*, 698 N.W.2d 858, 867-68 (Iowa 2005):

> [W]hen the asserted harm is a "generalized grievance" shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction. Thus,
>> a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not provide a basis for standing.

---

On appeal, Wilbur states only, "the fathers of I.N. and S.F., both of whom live in the State of Iowa, could approach DHS and 'consent' to remove a child in Iowa during a visit without [her] consent. She has standing."

> The claimed nonobservance of the law, "standing alone," affects only the generalized interest of all citizens, and such an injury is abstract in nature, which is not sufficient for standing.

*Id.* at *3 (citations omitted). In *Banks*, we found the appellant's past injury was not sufficient to establish standing to challenge the government's actions through declaratory action. *Id.* at *4. Wilbur's interest to prevent possible future injury rises no higher than any other member of the general public. We therefore conclude Wilbur has no standing to challenge DHS's actions by declaratory action.

> Our self-imposed standing inquiry has two distinct prongs, each of which a plaintiff must satisfy to proceed with a claim. "Our cases have determined that a complaining party must (1) have a specific personal or legal interest in the litigation and (2) be injuriously affected." *Citizens for Responsible Choices v. City of Shenandoah*, 686 N.W.2d 470, 475 (Iowa 2004); *see also Alons v. Iowa Dist. Ct.*, 698 N.W.2d 858, 869 (Iowa 2005). This inquiry is separate from, and precedes, the merits of a case. *See Alons*, 698 N.W.2d at 864 ("Even if the claim could be meritorious, the court will not hear the claim if the party bringing it lacks standing.").

*Horsfield Materials, Inc. v. City of Dyersville*, 834 N.W.2d 444, 452 (Iowa 2013).

We have recognized a public-policy exception where certain questions of great public importance may provide the necessary interest for the court to intervene. Godfrey, 752 N.W.2d at 425. However, "we become especially hesitant to act when asked to resolve disputes that require us to decide whether an act taken by one of the other branches of government was unconstitutional." *Id.* at 427. "Without an individual injury by the complainant under such circumstances, we risk assuming 'a position of authority' over the acts of another branch of government. We must avoid such a result." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 574 (1992)).

We have often noted that "[a]n injunction is an extraordinary remedy which should be granted with caution and only when clearly required to avoid irreparable damage." The party seeking the injunction must establish: (1) an invasion or threatened invasion of a right; (2) that substantial injury or damages will result unless the request for an injunction is granted; and (3) that there is no adequate legal remedy available. When considering the appropriateness of an injunction "the court should carefully weigh the relative hardship which would be suffered by the enjoined party upon awarding injunctive relief."

*Sear v. Clayton Cnty. Zoning Bd. of Adjustment*, 590 N.W.2d 512, 515 (Iowa 1999) (citations omitted); *see also City of Okoboji v. Parks*, 830 N.W.2d 300, 309 (Iowa 2013) (stating same requirements for injunction). We agree with the director's contention Wilbur has not established the necessary elements for obtaining injunctive relief.

The district court based its declaratory relief on Iowa Rule of Civil Procedure 1.1101, which provides, "Courts of record within their respective jurisdictions shall declare rights, status, and other legal relations whether or not further relief is or could be claimed." The district court also cited *Bormann v. Board of Supervisors*, 584 N.W.2d 309, 312-13 (Iowa 1998) (discussing Iowa Rule of Civil Procedure 261 (now rule 1.1101)). *Bormann* states: "The purpose of a declaratory judgment is to determine rights in advance. The essential difference between such an action and the usual action is that no actual wrong need have been committed or loss incurred to sustain declaratory judgment relief." 584 N.W.2d at 312-31. Yet, *Bormann* emphasizes, "there must be *no uncertainty that the loss will occur or that the right asserted will be invaded*." *Id.* at 313 (emphasis added). Wilbur makes no showing of a certainty her custodial rights will be invaded by the asserted claims of unconstitutional conduct by DHS.

The district court declared

> it is unconstitutional for the Iowa Department of Human Services to use Voluntary Foster Care Placement Agreements signed by only one parent when the use of such Agreements interferes with the custodial rights of the other parent, and it is unconstitutional for the Iowa Department of Human Services to use Voluntary Foster Care Placement Agreements signed by a non-custodial parent or a parent who has not yet established any custodial rights.

The trial court's declarations treat a "custodial" parent's rights as absolute. They are not. *See K.M.*, 653 N.W.2d at 608.

Much of Wilbur's arguments are based upon her contention that she proved her claims of violations of constitutional rights as a matter of law. Thus, she asserts the district court could appropriately enter declaratory and injunctive relief. She cites *Heartland Academy Community Church v. Waddle*, 427 F.3d 525, 530 (8th Cir. 2005), wherein the Eighth Circuit stated: "An injunction to prevent [a state officer] from doing that which he has no legal right to do is not an interference with the discretion of an officer." *Waddle*, 427 F.3d at 530. We, therefore, turn to her cross-appeal.

*C. Cross Appeal.* Wilbur filed post-trial motions seeking judgment notwithstanding the verdict (JNOV) or a new trial. She also contends on appeal that the trial court improperly instructed the jury.

Wilbur argues Nino "could not provide valid consent" for LaFauce to place I.N. outside of Wilbur's care. She relies on Iowa Code section 600B.40, which she asserts not only gives her sole custody but negates Nino's rights to the child. We believe Wilbur reads the provision too broadly.

Iowa Code section 600B.40 provides,

The mother of a child born out of wedlock *whose paternity has not been acknowledged* and who has not been adopted has sole custody of the child unless the court orders otherwise. If a judgment of paternity is entered, the father may petition for rights of visitation or custody in the same paternity action or in an equity proceeding separate from any action to establish paternity.

(Emphasis added.)

It has been said that paternity is acknowledged

[i]f in his intercourse with neighbors, associates, and friends he makes no attempt to conceal the relationship he bears to the child, but acknowledges it openly whenever any reference to the subject is made, and this recognition is so often repeated to different people as to evince his willingness that all who care to know the truth may understand that he admits himself the father of the child, we regard it as sufficiently general for the purposes of the statutory rule, although many of his acquaintances may never have heard him mention the matter.

*In re Estate of Wise*, 221 N.W. 567, 568 (Iowa 1928).

There is no dispute Nino is the child's biological father and he openly acknowledged his paternity of the child. Wilbur agreed to allow Nino to exercise visitation with I.N. the weekend of November 6 to 8. Wilbur at the time was in Texas. While the child was in Nino's care and custody, and while Wilbur was out of state, concerns about possible sexual abuse arose. Under these circumstances, we are not willing to rule as a matter of law that a biological parent cannot consent to placing the child in a safe setting such as voluntary foster care until investigation could be completed. We find no error in the trial court's allowing the jury to consider whether a "parent" consented to voluntary placement in foster care.

Our standard of review on motions JNOV was recently summarized by our supreme court:

We review a ruling denying a motion for judgment notwithstanding the verdict for correction of errors at law. *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010). On review, we "determine whether sufficient evidence existed to justify submitting the case to the jury at the conclusion of the trial." *Lee v. State*, 815 N.W.2d 731, 736 (Iowa 2012). To justify submitting the case to the jury, substantial evidence must support each element of the plaintiff's claim. *Van Sickle Constr. Co. v. Wachovia Commercial Mortg., Inc.*, 783 N.W.2d 684, 687 (Iowa 2010). "Evidence is substantial when reasonable minds would accept the evidence as adequate to reach the same findings." *Doe v. Cent. Iowa Health Sys.*, 766 N.W.2d 787, 790 (Iowa 2009). We view "the evidence in the light most favorable to the nonmoving party." *Id.*

*Garr v. City of Ottumwa*, 846 N.W.2d 865, 869 (Iowa 2014).

"To prevail under § 1983, a plaintiff must show that one of his or her federal rights has been violated." *Swipies v. Kofka*, 419 F.3d 709, 717 (8th Cir. 2005). Wilbur contends the district court erred in instructing the jury her substantive due process claim required a finding by the jury that "actions of Paul LaFauce were so egregious as to shock the conscience." She contends there is a dispute among the federal circuit courts as to the proper standard. However, we agree with the trial court that the Eighth Circuit, which includes Iowa, requires such a showing. *See Schmidt v. Des Moines Pub. Schools*, 655 F.3d 811, 816 (8th Cir. 2011) ("To establish a violation [of substantive due process], a plaintiff 'must demonstrate *both* that the official's conduct was <u>conscience-shocking</u>, *and* that the official violated one or more fundamental rights that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" (underlining added)).

With respect to whether substantial evidence supported the jury's findings, we adopt the district court's ruling:

There was substantial evidence presented at trial that [I.N.] suffered little to no long term harm. While [I.N.] spent two or three days in foster care and another week with [Nino]'s sister, Jana Brown's testimony provided substantial evidence that [I.N.] was not subject to abuse during this time period and did not suffer significant medical trauma. [Wilbur] was not in Iowa when the process of placing [I.N.] in foster care and with [Nino]'s sister began, and it is unclear exactly when [Wilbur] would have returned had these events not occurred. DHS is charged with protecting children within Iowa. When all of the facts are considered, there was substantial evidence presented at trial for the jury to conclude that there was no "shock the conscience" type harm in this case. While there undoubtedly was anxiety and stress caused by the situation, there was little to no evidence that there was any long term effect that was harmful to [I.N.] Plaintiff's Motion should be denied as to the substantive due process claims.

Turning to the procedural due process claims, the Court finds there was substantial evidence presented at trial that Mr. LaFauce was investigating a complex case involving separated parents and other relative caretakers in a multi-county and multi-state context, all while considering the implications of [Nino]'s placement on the Sex Offender Registry. [Nino]'s testimony regarding [I.N.]'s condition at the time he picked her up for the weekend visit, coupled with the fact that blood was found in her underpants, is substantial evidence to support Mr. LaFauce's reasonable suspicion of child abuse, such that it was reasonable for Mr. LaFauce to monitor and investigate the situation. The consent process undertaken by Mr. LaFauce was not ideal, but given the complexity of the circumstances, Mr. LaFauce obtaining written consent from [Nino] for the placement of [I.N.] into foster care was an exercise of the State's legitimate interest in protecting children in emergency situations. Further, there was substantial evidence that [Wilbur] consented to placement of [I.N.] with Ruby. Plaintiff's Motion should be denied as to the procedural due process claims.

With respect to the claim of a violation of I.N.'s Fourth Amendment rights, the district court stated:

[T]here was substantial evidence presented at trial to support a finding that [I.N.] did not suffer a violation of her right to privacy. [I.N.] was placed into foster care and then into her aunt's home based on a [voluntary foster care placement agreement] obtained by Mr. LaFauce. If there was a seizure, there is substantial evidence that the seizure was reasonable due to the consent provided by [Nino] and because of the safety concerns presented by [I.N.]'s physical condition when she arrived at [Nino]'s parents'

home for the weekend visit, as well as the continuing investigation of the abuse and neglect allegations and [Wilbur]'s presence out of state. Plaintiff's Motion should be denied as to [I.N.]'s right to privacy claim.

We affirm on the cross-appeal.

*D. Attorney fees for prevailing party.* The trial court awarded Wilbur attorney fee's fees as a "prevailing party." *See* 42 U.S.C. § 1988 (allowing "[i]n any action or proceeding to enforce" the provisions of § 1983 "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs"). Because we have reversed the declaratory and injunctive relief upon which the trial court based the award of attorney fees and costs, we reverse the award of attorney fees and costs.

**REVERSED ON APPEAL; AFFIRMED ON CROSS-APPEAL.**

Doyle, J., concurs; McDonald, J., concurs specially.

**MCDONALD, Judge.** (concurring specially)

I concur in the majority's resolution of the parties' respective appeals. I write separately to note our adoption of the shock-the-conscience standard, *ante* at 32, is correct on the merits and not required merely because the United States Court of Appeals for the Eighth Circuit has adopted the standard. As explained by Justice Thomas:

> The Supremacy Clause demands that state law yield to federal law, but neither federal supremacy nor any other principle of federal law requires that a state court's interpretation of federal law give way to a (lower) federal court's interpretation. In our federal system, a state trial court's interpretation of federal law is no less authoritative than that of the federal court of appeals in whose circuit the trial court is located. An Arkansas trial court is bound by this Court's (and by the Arkansas Supreme Court's and Arkansas Court of Appeals') interpretation of federal law, but if it follows the Eighth Circuit's interpretation of federal law, it does so only because it chooses to and not because it must.

*Lockhart v. Fretwell*, 506 U.S. 364, 376 (1993) (Thomas, J., concurring).